This search warrant package has been reviewed and approved by the undersigned AUSA

Digitally signed by JASON SCHEFF
Date: 2026.04.09 14:39:36 -04'00'

Jason M. Scheff
Assistant United States Attorney

CLERKS OFFICE US DISTRICT COURT
AT HARRISONBURG, VA
FILED

04/13/2026

LAURA A. AUSTIN, CLERK
BY: /s/ Amy Fansler
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
CHARLOTTESVILLE  DIVISION

IN THE MATTER OF THE SEARCH OF:
825 KNIGHT COURT,
CHARLOTTESVILLE, VA 22901; THE
PERSON OF DANIA DANEY ORELLANA-
GAMEZ; ORELLANA-GAMEZ'S
ELECTRONIC DEVICES

Case No. 3:26mj19

**AFFIDAVIT IN SUPPORT OF
AN APPLICATION FOR A SEARCH WARRANT**

I, Benjamin Thorn, being first duly sworn, hereby depose and state as follows:

## I.    INTRODUCTION

### A.  Purpose of Affidavit

1.    I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a warrant authorizing the search of the following (collectively referred to as the "**SUBJECT ITEMS**"):

a.    825 Knight Court, Charlottesville, VA 22901 (the "**SUBJECT PREMISES**" (further described in Attachment A-1);

b.    The person of Dania Daney ORELLANA-Gamez ("**ORELLANA**") (further described in Attachment A-2); and

1

c.      Any electronic devices collected from the **SUBJECT PREMISES** or the person of **ORELLANA** for which there is probable cause that such a device belongs to or is used by **ORELLANA** (the "**SUBJECT DEVICES**") (further described in Attachment A-3).

2.      Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to search the **SUBJECT PREMISES**, **ORELLANA**, and the **SUBJECT DEVICES**, which are further described in Attachments A-1, A-2, and A-3 for the items described in Attachments B-1, B-2, and B-3 respectively. There is probable cause that the items described in Attachments B-1, B-2, and B-3 constitute evidence of the offense described below.

3.      I request authority to search the **SUBJECT PREMISES** in their entirety—including the property, outbuildings, all persons, and motor vehicles located on the property—where the items specified in Attachment B-1, incorporated herein by reference, may be found, and to seize all items listed in Attachment B-1 as instrumentalities, fruits, and evidence of criminal activity.  This search is to be conducted by locating digital devices and other recording materials or records that could contain evidence of the offense described below.

4.      The applied-for warrant would authorize the forensic examination of any of the **SUBJECT DEVICES** found at the **SUBJECT PREMISES** or in **ORELLANA**'s possession (if there is probable cause that such a device belongs to or is used by **ORELLANA**) for the purpose of identifying electronically stored data described in Attachment B-3.

## B.  Agent Background and Experience

5.      I am a Special Agent with the Department of Homeland Security (DHS), Homeland Security Investigations (HSI), currently assigned to Harrisonburg, Virginia, and have been so employed since June 2023.

2

6.　　In my current capacity as a Special Agent, I am responsible for investigating various types of criminal activity, including witness tampering and obstruction of justice.  My training includes basic, advanced, and on-the-job training in this investigative area, among others. I am familiar with procedures for obtaining and executing federal search warrants, and I have led and participated in the execution of numerous search and arrest warrants related to obstruction and interference offenses, child exploitation, firearms and narcotics violations, money laundering, and fraud.

7.　　I am a graduate of the Federal Law Enforcement Training Center (FLETC) Criminal Investigator Training Program (CITP), and Homeland Security Investigations Special Agent Training (HSISAT) in Glynco, Georgia.  During training I received general and specific classroom instruction and engaged in practical exercises involving Fourth Amendment search and seizures.

8.　　Prior to my tenure as a Special Agent with HSI, I was employed by the West Virginia State Police from 2013 to 2023. And I was previously employed by the Cumberland Township Police Department and East Washington Boro Police Department in Southwestern Pennsylvania, between 2012 and 2013.

9.　　I also hold a Bachelor of Science in Criminal Justice, with a focus on Law and Justice, from California University of Pennsylvania and a Municipal Police Certification from Westmoreland County Community College Police Academy.

### C. Sources of Information

10.　　Because this affidavit is being submitted for the limited purpose of securing a search warrant, I have not included details of every aspect of, or each and every fact known to me concerning, this investigation. I make this affidavit based on personal knowledge and information

3

received from other law enforcement officers and/or agents. Unless otherwise noted, wherever in this affidavit I assert that a statement was made, the information was provided by another law enforcement officer or witness who may have had either direct or hearsay knowledge of that statement and to whom I or others have spoken, or whose reports I have read and reviewed. Such statements are among many statements made by others and are stated in substance and in part unless otherwise indicated.

11.     Further, my interpretations and explanations of the significance of certain events, records, and statements discussed herein may evolve or change as the investigation progresses and/or new information is discovered.  I have set forth only the facts that I believe are necessary to establish probable cause to believe that evidence, fruits, and instrumentalities of the target offense will be presently located at or in the **SUBJECT ITEMS**.

12.     Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe Dania **ORELLANA** has violated Title 18, United States Code, Section 1512(b)(1) (Tampering with a witness, victim, or an informant).  There is also probable cause to search the information described in Attachments A-1, A-2, and A-3 for the evidence, instrumentalities, contraband, and fruits of the criminal activity further described in Attachment B-1, B-2, and B-3, respectively.

## II.    TARGET OFFENSE

13.     The **TARGET OFFENSE**, 18 U.S.C. § 1512(b)(1), prohibits an individual from "knowingly us[ing] intimidation, threaten[ing], or corruptly persuad[ing] another person, or attempt[ing] to do so, or engag[ing] in misleading conduct toward another person, with intent to . . . influence, delay, or prevent the testimony of any person in an official proceeding."

4

### III.    PROBABLE CAUSE

14.    On or about September 16, 2025, the Honorable Joel C. Hoppe found probable cause that Bryan Sixto Arias-Chicas had committed a violation of 18 U.S.C. § 2251(a) in relation to the sexual assault of a 16-year-old girl (MV1) that had occurred in Charlottesville and Albemarle County in May 2025. Specifically, law enforcement had been able to determine that Arias-Chicas had filmed himself having sex with MV1 and had taken several photos and videos of MV1 that displayed MV1 engaging in sexually explicit conduct. These photos and videos were located on Arias-Chicas's cell phone when he was arrested.

15.    On or about October 3, 2025, Arias-Chicas was taken into federal custody on this charge and has remained in federal custody. Arias-Chicas was living at the **SUBJECT PREMISES** prior to being arrested.

16.    On or about December 10, 2025, a grand jury sitting in the Western District of Virginia returned an indictment charging Gustavo Quintero with various crimes in relation to his contact with MV1 in the aftermath of the May sexual assault.

17.    Late at night on or about February 10, 2026, MV1 (who had since turned 17) reported to the U.S. Attorney's Office and to law enforcement that she had received threats regarding the information that she had provided to law enforcement regarding the May sexual assault.

18.    On or about February 11, 2026, I spoke with MV1 who advised that, on Tuesday, February 10, 2026, around 9:30pm, she was at her mother's house, located within the Western District of Virginia, when she received a Facebook friend request from Dania ORELLANA. MV1 accepted the friend request.

19.     Law enforcement databases have since revealed that ORELLANA has a number of addresses within the Charlottesville area and is believed to live at one of those addresses, all of which are located within the Western District of Virginia. One of those addresses is the **SUBJECT PREMISES**.

20.     MV1 stated she looked at ORELLANA's profile and observed pictures of her with Arias-Chicas. Based on this information, it appeared to MV1 that ORELLANA was the girlfriend of Arias-Chicas.

21.     MV1 and ORELLANA then proceeded to have a conversation via Facebook Messenger.

22.     Facebook users can use Facebook Messenger to communicate with other users via text, voice, and video, including via an app that can be downloaded onto a Facebook user's cell phone. I know from my training and experience that individuals frequently use their cell phones to access and use Facebook Messenger, especially younger Facebook users. ORELLANA is 20 years old.

23.     ORELLANA used Facebook Messenger to send harassing and threatening messages to MV1, including the following:[1]

---

[1] MV1's messages are on the right side in blue, and ORELLANA's are on the left side in gray.

6







But you're not that little, you were too young to know what you were doing. Tell them you didn't want alcohol, that you weren't going to mess with them, you had a conscience, you bitch.

So you think he did nothing wrong?

Having sex with a blacked out minor?

I couldnt consent to sex while I was that fucked up.

You wanted it to be this way because there are videos, and those videos have already been seen. That's why I'm telling you, you slept around with several women and then you go around acting like a innocent victim.

↩ Dania replied to you

I couldnt consent to sex while I was that fucked up.

You did well, little dog.

😂😂



They're accusing you of being raped, but they won't put your name. If they won't put it, we will, so they can see the kind of person you are.

You weren't unconscious because you were aware they were offering you alcohol and you agreed to get in the car. You even told them to buy alcohol because you have problems with your family, and then you want to play the innocent little dog

There are photos and videos that show you were aware of having sex, that's why I told you there's proof, and you're going to get even more judged because it's you in that video. It's better if you keep quiet because you're going to suffer harassment for being raped, according to you and your family. It's you, you little bitch, find someone of your own kind to step on you, you fucking monkey.

Of course there are

And he told you there are videos because I saw t ↓ and that's why he told you it's in your best

8



24.    In some of these messages, ORELLANA appears to imply she is in possession of CSAM videos of MV1 and threatens to post them "everywhere."

25.    ORELLANA also makes threats to MV1 if she were to testify. For example, I understand ORELLANA's statement "It's better if you keep quiet…" to imply that MV1 should not testify against Arias-Chicas and should not continue to cooperate with law enforcement.

26.    MV1 was concerned about the messages and believed ORELLANA was attempting to scare her into not testifying in court.

27.    The conversation between MV1 and ORELLANA is very threatening in nature, and it appears that ORELLANA is aware of the content of the CSAM videos that were recorded by Arias-Chicas and may have even seen them. Additionally, ORELLANA indicated to MV1 that she possesses copies of these videos (or has access to copies of these videos) based on her repeated

9

threats to upload the videos. There is thus probable cause that these videos and/or communications about these videos are located on the **SUBJECT DEVICES**.

28.    I was able to find a Facebook profile (dania.orellana.997092) for Dania ORELLANA, which showed pictures of ORELLANA and Arias-Chicas together.

29.    On or about February 26, 2026, the Honorable Joel C. Hoppe found probable cause to issue a search warrant to Meta for the Facebook profile of ORELLANA.

30.    In response to the search warrant, Meta provided information showing that the phone number associated with ORELLANA's account is 434-257-8466 and that that number was verified for the profile on or about October 3, 2025. ORELLANA has frequently utilized this phone number to contact Arias-Chicas while he has been in custody.

31.    On or about February 25, 2026, I served legal process on T-Mobile US, Inc., regarding the phone number 434-257-8466.

32.    T-Mobile records show that the phone number 434-257-8466 is registered to ▆▆▆▆ ▆▆▆▆▆▆▆▆ (using the **SUBJECT PREMISES** as the account address). This account has more than 2 phone lines on the account.

33.    The records provided by Meta also revealed that ORELLANA has accessed her Facebook account using an iPhone 17.

34.    The information provided by Meta also revealed the following information about ORELLANA's Facebook account:

   a.    On or about November 22, 2025, ORELLANA reported MV1's profile to Meta, claiming that it was a fake account, but Meta denied that the profile was in violation of community standards.

10

b.    On or about February 8, 2026, ORELLANA searched for MV1's name on Facebook. This was approximately two days before ORELLANA started threatening MV1.

c.    On or about February 9, 2026, ORELLANA sent MV1 a Facebook friend request.

d.    Between on or about February 9, 2026, and on or about February 11, 2026, ORELLANA searched for or visited MV1's Facebook profile approximately 20 times.

35.    Review of the Meta records showed that ORELLANA's Facebook account was accessed using IP address 73.216.46.144 during the timeframe in which ORELLANA was communicating with MV1. On or about March 23, 2026, I served legal process on Comcast Communications for information pertaining to that IP address.

36.    Comcast records show that that IP address was registered in the name of " ███████ ███ " (using the **SUBJECT PREMISES** as the account address) during the relevant timeframe.

37.    Law enforcement system checks confirmed that ███████████ appears to be the mother of Bryan Arias-Chicas. Based on the above information, it appears that ORELLANA has been living with Arias-Chicas's mother at the **SUBJECT PREMISES**.

38.    Between on or about March 30, 2026, and on or about April 3, 2026, HSI conducted surveillance of the **SUBJECT PREMISES**. On or about Friday, April 3, 2026, HSI observed ORELLANA in front of the **SUBJECT PREMISES** and saw her get into a Ford Fusion with Virginia registration SZM8028, which is registered to ███████████ .

## IV.    COMPUTERS, ELECTRONIC STORAGE, AND FORENSIC ANALYSIS

39.    As described above and in Attachments B-1 and B-2, this application seeks permission to search for records that might be found on the **SUBJECT PREMISES** and on **ORELLANA**'s person, in whatever form they are found. One form in which the records might

11

be found is data stored on a computer or electronic device's hard drive or other storage media (i.e., the **SUBJECT DEVICES**).  Thus, the warrant applied for would authorize the seizure of electronic storage media or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

40.    *Probable cause.*  I submit that if a computer, electronic device, or storage medium is found on the **SUBJECT PREMISES** or on **ORELLANA**'s person, there is probable cause to believe that applicable records will be stored on that computer, electronic device, or storage medium, for at least the following reasons:

a.    Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the internet.  Electronic files downloaded to a storage medium can be stored for years at little or no cost.  Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a computer or electronic device, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

b.    Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten.  In addition, a computer or electronic device's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c.    Wholly apart from user-generated files, computer or electronic device storage media—in particular, internal hard drives—contain electronic evidence of how a

computer or electronic device has been used, what it has been used for, and who has used it.  To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files.  Computer and electronic device users typically do not erase or delete this evidence, because special software is typically required for that task.  However, it is technically possible to delete this information.

> d.      Similarly, files that have been viewed via the internet are sometimes automatically downloaded into a temporary internet directory or "cache."

41.      *Forensic evidence.*  As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also for forensic electronic evidence that establishes how a device was used, the purpose of its use, who used the device, and when.  There is probable cause to believe that this forensic electronic evidence will be on devices and any storage medium found on **ORELLANA**'s person and at the **SUBJECT PREMISES** (i.e., the **SUBJECT DEVICES**) because:

> a.      Data on a storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).  Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active.  Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords.  Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other

13

external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created, although this information can later be falsified.

b.      As explained herein, information stored within a computer and other electronic storage media may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or, alternatively, to exclude the innocent from further suspicion. In my training and experience, information stored within a computer or storage media (e.g., registry information; communications; images and movies; transactional information; records of session times and durations; internet history; and anti-virus, spyware, and malware detection programs) can indicate who has used or controlled the computer or storage media. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. The existence or absence of anti-virus, spyware, and malware detection programs may indicate whether the computer was remotely accessed, thus inculpating or exculpating the computer owner. Further, computer and storage media activity can indicate how and when the computer or storage media was accessed or used. For example, as described herein, computers typically contain information that log: computer user account session times and durations, computer activity associated with user accounts, electronic storage media that connected with the computer, and the IP addresses through which the computer accessed networks and the internet. Such information allows investigators to understand the chronological context of computer or electronic storage media access, use, and events relating to the crime under investigation. Additionally, some information stored within a computer or electronic

14

storage media may provide crucial evidence relating to the physical location of other evidence and the suspect. For example, images stored on a computer may both show a particular location and have geolocation information incorporated into its file data. Such file data typically also contains information indicating when the file or image was created. The existence of such image files, along with external device connection logs, may also indicate the presence of additional electronic storage media (e.g., a digital camera or cellular phone with an incorporated camera). The geographic and timeline information described herein may either inculpate or exculpate the computer user. Last, information stored within a computer may provide relevant insight into the computer user's state of mind as it relates to the offense under investigation. For example, information within the computer may indicate the owner's motive and intent to commit a crime (e.g., internet searches indicating criminal planning), or consciousness of guilt (e.g., running a "wiping" program to destroy evidence on the computer or password protecting/encrypting such evidence in an effort to conceal it from law enforcement).

c.      A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

d.      The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. While it is possible to specify in advance the records to be sought, computer evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of

15

knowledge about how a computer behaves.  Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e.      Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.  For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

f.      I know that when an individual uses a computer or electronic device to intimidate a witness or victim, the individual's computer or device will generally serve both as an instrumentality for committing the crime and also as a storage medium for evidence of the crime.  The computer or electronic device is an instrumentality of the crime because it is used as a means of committing the criminal offense.  The computer or electronic device is also likely to be a storage medium for evidence of the crime.  From my training and experience, I believe that a computer or electronic device used to commit a crime of this type may contain: data that is evidence of how the computer or electronic device was used; data that was sent or received; notes as to how the criminal conduct was achieved; records of internet discussions about the crime; and other records that indicate the nature of the offense.

42.     *Necessity of seizing or copying entire computers or storage media.*  In most cases, a thorough search of a premises for information that might be stored on storage media often requires the seizure of the physical storage media and later off-site review consistent with the warrant.  In lieu of removing storage media from the premises, it is sometimes possible to make an image copy of storage media.  Generally speaking, imaging is the taking of a complete

electronic picture of the computer's data, including all hidden sectors and deleted files.  Either seizure or imaging is often necessary to ensure the accuracy and completeness of data recorded on the storage media, and to prevent the loss of the data either from accidental or intentional destruction.  This is true because of the following:

a.     The time required for an examination. As noted above, not all evidence takes the form of documents and files that can be easily viewed on site.  Analyzing evidence of how a computer or electronic device has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on premises could be unreasonable.  As explained above, because the warrant calls for forensic electronic evidence, it is exceedingly likely that it will be necessary to thoroughly examine storage media to obtain evidence.  Storage media can store a large volume of information.  Reviewing that information for things described in the warrant can take weeks or months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.

b.     Technical requirements.  Computers and electronic devices can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations.  Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site.  The vast array of computer hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data on the premises.  However, taking the storage media off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

17

c.    Variety of forms of electronic media.  Records sought under this warrant could be stored in a variety of storage media formats that may require off-site reviewing with specialized forensic tools.

43.    *Nature of examination.*  Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit seizing, imaging, or otherwise copying storage media that reasonably appear to contain some or all of the evidence described in the warrant (i.e., the **SUBJECT DEVICES**) and would authorize a later review of the media or information consistent with the warrant.  The later review may require techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

## V.    BIOMETRIC ACCESS TO DEVICE(S)

44.    This warrant permits law enforcement agents to obtain from the person of **ORELLANA** (but not any other individuals) the compelled display of any physical biometric characteristics (such as fingerprint/thumbprint or facial characteristics) necessary to unlock any electronic device requiring such biometric access subject to seizure pursuant to this warrant for which law enforcement has reasonable suspicion that **ORELLANA**'s physical biometric characteristics will unlock an electronic device. The grounds for this request are as follows:

45.    I know from my training and experience, as well as from information found in publicly available materials published by device manufacturers, that many electronic devices, particularly newer mobile devices and laptops, offer their users the ability to unlock the device through biometric features in lieu of a numeric or alphanumeric passcode or password. These biometric features include fingerprint scanners, facial recognition features, and iris recognition

18

features. Some devices offer a combination of these biometric features, and the user of such devices can select which features they would like to utilize.

46.    If a device is equipped with a fingerprint scanner, a user may enable the ability to unlock the device through his or her fingerprints. For example, Apple offers a feature called "Touch ID," which allows a user to register up to five fingerprints that can unlock a device. Once a fingerprint is registered, a user can unlock the device by pressing the relevant finger to the device's Touch ID sensor, which is found in the round button (often referred to as the "home" button) located at the bottom center of the front of the device. The fingerprint sensors found on devices produced by other manufacturers have different names but operate similarly to Touch ID.

47.    If a device is equipped with a facial-recognition feature, a user may enable the ability to unlock the device through his or her face. For example, this feature is available on certain Android devices and is called "Trusted Face." During the Trusted Face registration process, the user holds the device in front of his or her face. The device's front-facing camera then analyzes and records data based on the user's facial characteristics. The device can then be unlocked if the front-facing camera detects a face with characteristics that match those of the registered face. Facial recognition features found on devices produced by other manufacturers (such as Apple's "Face ID") have different names but operate similarly to Trusted Face.

48.    If a device is equipped with an iris-recognition feature, a user may enable the ability to unlock the device with his or her irises. For example, on certain Microsoft devices, this feature is called "Windows Hello." During the Windows Hello registration, a user registers his or her irises by holding the device in front of his or her face. The device then directs an infrared light toward the user's face and activates an infrared-sensitive camera to record data based on patterns within the user's irises. The device can then be unlocked if the infrared-sensitive camera detects the

19

registered irises. Iris-recognition features found on devices produced by other manufacturers have different names but operate similarly to Windows Hello.

49.     In my training and experience, users of electronic devices often enable the aforementioned biometric features because they are considered to be a more convenient way to unlock a device than by entering a numeric or alphanumeric passcode or password. Moreover, in some instances, biometric features are considered to be a more secure way to protect a device's contents. This is particularly true when the users of a device are engaged in criminal activities and thus have a heightened concern about securing the contents of a device.

50.     As discussed in this Affidavit, I have reason to believe that one or more electronic devices will be found during the search. The passcode or password that would unlock a device subject to search under this warrant currently is not known to law enforcement. Thus, law enforcement personnel may not be able to access the data contained within any electronic devices without the use of biometric features, making the use of biometric features necessary to the execution of the search authorized by this warrant.

51.     I also know from my training and experience, as well as from information found in publicly-available materials, including those published by device manufacturers, that biometric features will not unlock a device in some circumstances even if such features are enabled. This can occur when a device has been restarted, inactive, or has not been unlocked for a certain period of time. For example, Apple devices cannot be unlocked using Touch ID when: (1) more than 48 hours has elapsed since the device was last unlocked, or (2) when the device has not been unlocked using a fingerprint for 8 hours and the passcode or password has not been entered in the last 6 days. Similarly, certain Android devices cannot be unlocked with Trusted Face if the device has remained inactive for four hours. Biometric features from other brands carry similar restrictions.

20

Thus, in the event law enforcement personnel encounter a locked device equipped with biometric features, the opportunity to unlock the device through a biometric feature may exist for only a short time.

52.     Due to the foregoing, if law enforcement personnel encounter any devices that are subject to seizure pursuant to this warrant and may be unlocked using one of the aforementioned biometric features, this warrant permits law enforcement personnel to obtain from **ORELLANA** the display of any physical biometric characteristics (such as fingerprint/thumbprint or facial characteristics) necessary to unlock any devices, including to (1) press or swipe the fingers (including thumbs) of the **ORELLANA** to the fingerprint scanner of any devices found in the search; (2) hold the found devices in front of the face of **ORELLANA** to activate the facial recognition feature; and/or (3) hold the found devices in front of the face of **ORELLANA** to activate the iris recognition feature, for the purpose of attempting to unlock any devices in order to search the contents as authorized by this warrant.

53.     The proposed warrant does not authorize law enforcement to require that **ORELLANA** state or otherwise provide the password, or identify specific biometric characteristics (including the unique finger(s) or other physical features) that may be used to unlock or access any devices. Nor does the proposed warrant authorize law enforcement to use the fact that the warrant allows law enforcement to obtain the display of any biometric characteristics to compel **ORELLANA** to state or otherwise provide that information. However, the voluntary disclosure of such information **ORELLANA** would be permitted under the proposed warrant. To avoid confusion on that point, if agents in executing the warrant ask **ORELLANA** for the password to any devices, or to identify which biometric characteristic (including the unique finger(s) or other physical features) unlocks any devices, the agents will not state or otherwise

21

imply that the warrant requires **ORELLANA** to provide such information and will make clear that providing any such information is voluntary and that **ORELLANA** is free to refuse the request.

## VI.   CONCLUSION

1.    I submit that this affidavit supports probable cause for a warrant to search the **SUBJECT PREMISES**, **ORELLANA**'s person, and the **SUBJECT DEVICES**, further described in Attachments A-1, A-2, and A-3, and seize the items described in Attachments B-1, B-2, and B-3, respectively.

2.    Based on the foregoing, I request that the Court issue the proposed search warrant.

## OATH

The information in this affidavit is true to the best of my knowledge and belief.

/s/ Benjamin Thorn
Benjamin Thorn
Special Agent
Homeland Security Investigations

Attested to in accordance with the requirements of Fed. R. Crim. P. 4.1 via telephone on this 13th of April 2026.

JOEL C. HOPPE
UNITED STATES MAGISTRATE JUDGE

22